## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**L. RONALD BROWN,**

        **Plaintiff,**

**v.**                                          **Case No:  6:11-cv-1074-Orl-36DAB**

**LASSITER-WARE, INC.,**

        **Defendant.**

---

## ORDER

    This cause comes before the Court on Defendant Lassiter-Ware, Inc.'s. ("Defendant" or "LWI") Motion for Summary Judgment (Doc. 46).  Plaintiff L. Ronald Brown ("Plaintiff") filed a response in opposition to LWI's Motion for Summary Judgment ("Response") (Doc. 52), to which LWI replied (Doc. 62).  Upon consideration of the parties' submissions, including memoranda and accompanying exhibits, and for the reasons that follow, LWI's Motion for Summary Judgment will be granted in part and denied in part.

## I.  BACKGROUND

### A.  Statement of Facts[1]

    1.  *Plaintiff's Employment*

    LWI is a full-service independent insurance agency.  Doc. 60, ¶ 1.  On February 20, 2003, Plaintiff was hired by LWI to work in its Maitland, Florida branch office as a sales person in the Property and Casualty Division.  *Id.* at ¶¶ 3, 6; McClain Aff., Doc. 41, ¶ 2.  Plaintiff, whose date of birth is March 5, 1951, was 51 years old when he was hired by LWI.  *Id.* at ¶ 4.

---

[1] As the parties in this case submitted a Joint Stipulation of Agreed Material Facts (Doc. 60), the Court cites this document where facts are undisputed, and otherwise determines facts based on the parties' submissions, affidavits, and deposition testimony.

When Plaintiff applied for his position with LWI, he indicated that he was seeking full-time employment. Brown Dep., Doc. 49-1, 37:9–14. Christopher McClain, an employee at LWI, recommended to the management team, Ted Ostrander and John Hahne, that LWI hire Plaintiff. McClain Aff., Doc. 41, ¶ 2. Thereafter, McClain notified Plaintiff that the company had made the decision to offer him a position. Brown Dep., Doc. 49-1, 38:13–21. Plaintiff understood that this would be a full-time position. *Id.* at 38:22–24. At the time Plaintiff was hired, he signed an acknowledgment of LWI's Anti-Discrimination/Harassment policy, which included the procedure for initiating complaints of discrimination or harassment. *Id.* at 39:15–40:18; Doc. 49-3, pp. 8–10; Doc. 60, ¶ 7. Plaintiff acknowledged that he also received a copy of LWI's Family and Medical Leave Act ("FMLA") Policy. Brown Dep., Doc. 49-1, 41:11–42:3; Doc. 44, p. 11; Doc. 60, ¶ 8;.

McClain was Plaintiff's immediate supervisor. Doc. 60, ¶ 9. Plaintiff testified that, for the first five years of his employment, he and McClain "worked very well together." Brown Dep., Doc. 49-1, 47:19–48:3. Plaintiff exceeded LWI's annual new business sales goals in the fiscal years ending April 30, 2004 and April 30, 2006. *See* Doc. 49-3, p. 65. Plaintiff testified that he twice received LWI's "Circle of Excellence" award, which is awarded based upon annual sales performance. Brown Aff., Doc. 53-1, ¶ 5. Plaintiff also testified that he was rewarded with trips by LWI and its clients for his high level of production. *Id.* at ¶¶ 5–6.

However, Plaintiff felt that his relationship with McClain changed when McClain was promoted to vice president of sales in 2008. Brown Dep., Doc. 49-1, 48:4–10, 49:16–18. Once promoted, McClain began requiring employees to submit more reports and attend more frequent and longer sales meetings, and he became more involved with the sales force. *Id.* at 48:11–49:21. Plaintiff felt these changes were unfair because he was on straight commission and

should have been allowed to manage himself.  *Id.* at 52:13–21.  However, Plaintiff did not feel at any time that the sales goals placed on him were unfair.  *Id.* at 57:5–25.  Plaintiff also testified that his relationship with McClain became "very strained" because prior to McClain's promotion, the pair had socialized publicly and were friendly, but now it was just "strictly business."  *Id.* at 49:22–50:15.

By the end of 2008, the general insurance market began collapsing together with the rest of the economy, and LWI's revenues dropped "precipitously."  Ostrander Dep., Doc. 37, 22:17–21.  At that time, LWI's management and board of directors began discussing the possibility of layoffs.  *Id.* at 22:22–23:6.

2.     *Plaintiff's Illness*

Plaintiff testified that in January or February of 2009, he began experiencing headaches, flu-like symptoms, dizziness, and weakness "to the point of almost passing out."  Brown Dep., Doc. 49-1, 76:1–7, 93:1-94:5.  In February 2009, Plaintiff told McClain that he was experiencing severe fatigue.  *Id.* at 77:14–78:5.  McClain told him to go to the doctor.  *Id.* at 78:6–8.

Plaintiff visited Lydia Marsham, a physician's assistant, who diagnosed him with Epstein-Barr virus.  Dube Dep., Doc. 61-1, 29:1–30:3.  On March 25, 2009, Marsham wrote a doctor's note stating that Plaintiff was being treated and should remain off work from April 1, 2009, through May 1, 2009.  *Id.* at 47:1–10; *see* Doc. 49-3, p. 18.  Plaintiff presented the note to McClain.  Doc. 60, ¶ 14.  According to Plaintiff, McClain responded by telling him to "take a couple of weeks and then come back to work, that [Plaintiff] could not afford to take off an entire month, [he would] lose [his] job."  Brown Dep., Doc. 49-1, 75:2–9.  Plaintiff testified that McClain told him that if there was a recurrence of his symptoms, he should "just push through it."  *Id.* at 75:20–76:16.  McClain disputes this, testifying that he encouraged Plaintiff to take the time necessary to get better.  McClain Aff., Doc. 41, ¶ 8.  McClain denies that his remarks to

3

Plaintiff about "push[ing] through" were directed toward Plaintiff's medical condition, explaining that the remarks were part of a larger, ongoing conversation with Plaintiff about producing at a higher level:

> [M]y conversations with Mr. Brown about pushing through, working harder, being more focused, trying to attain higher sales has been an ongoing conversation that included the term push through it, let's get out there and make this happen, let's be aggressive, Ron, don't sit back.   This is not—this is not football.   We don't get—it's not defense; you don't get to sit on the bench.

> Ron Brown was a football player at the University of West Virginia.   He and I talked about these things all the time.   Ron, this is 42-7.   You don't—you don't get to sit on the bench while the rest of the team is out there and you're resting. You got to play all the time here.

> And this was conversations to Ron on an ongoing basis—not specific to this, by any means—that, that he needed to continue to work harder because he wasn't making his sales goals.   That was my job.   I do that with every single producer we have.

> So selectively singling out that one comment for this particular time is selective, selective memory.   He—we talked about this on an ongoing basis, so, yes, that term ["push through"] was used.

> …

> I indicated to Mr. Brown that leaving the sales production in a down cycle when his sales were not up, anywhere close to being—hitting his sales goal was indeed a bad time for any producer.

> And it wasn't necessarily Ron Brown.   I'm talking about producers in general—as a general animal; the producer can't pull out for a month when they're not hitting their sales goals.

McClain Dep., Doc. 39, 111:12–113:1.

McClain forwarded the doctor's note to E. Scott Bowers, LWI's Director of Human Resources, via email on March 26, 2009.   Doc. 60, ¶¶ 13, 15; *see* Doc. 41, p. 8.   The email contained the following message:

> Scott, I would like your thoughts on this.   Ron is very ill and has been having a very difficult time working through the week and I think this time off could be useful but my concern is will it solve the problem as his doctor can not be sure

how long this will last.  Ron is very concerned to be out this length of time because he will surely loose him [sic] momentum and not make his sales goals. He has been fighting this for the past 3 months and is willing to keep trying to work.  Have you seen this before and how was it handled or do you have any thoughts.

Doc. 41, p. 8.

On April 14, 2009, Bowers sent to Plaintiff, via regular mail, a letter indicating that LWI had been made aware of the possibility that Plaintiff may qualify for FMLA leave.  Bowers Dep., Doc. 34, 30:8–34:3; *see* Doc. 40, p. 7.  Also included in the mailing were LWI's FMLA policy and the Government-mandated forms, including a Notice of Eligibility and Rights & Responsibilities which indicated that Plaintiff was deemed eligible for FMLA leave beginning April 1, 2009, and that he was entitled to up to twelve weeks of unpaid leave.  Bowers Dep., Doc. 34, 30:11–15; *see* Doc. 40, pp. 7–14.  Plaintiff testified that he never received the mailing. Brown Dep., Doc. 49-1, 84:17–85:7.

After taking two weeks off, Plaintiff returned to work on April 13, 2009.  *Id.* at 78:13–80:7.  Shortly after his return to work, Plaintiff had a phone conversation with Bowers in which he told Bowers that he was not taking a full month of FMLA leave because he was scared he would lose his job.  *Id.* at 84:1–10.  Bowers told Plaintiff that he had to have a doctor's note stating that he could return to work, because he had only taken off two weeks rather than Marsham's recommendation of one month.  *Id.* at 81:8–82:8.  Plaintiff obtained a note from Suzan Weis, a nurse practitioner, dated April 20, 2009, which stated that he could return to work as of April 13, 2009.  *Id.* at 78:18–79:16; *see* Doc. 49-3, p. 31.  Plaintiff presented the note to Bowers and resumed working.  *See* Bowers Aff., Doc. 40, ¶ 8.

Plaintiff testified that, beginning with the onset of his illness in early 2009, he had difficulty "keeping up" with the increased reports and meetings required by McClain.  Brown Dep., Doc. 49-1, 54:17–55:14.  Plaintiff further testified that, from February 2009 through the

end of his employment, he was no longer working five days a week, nor was he working 40 to 50 hours a week. *Id.* at 70:10-71:25. Some days, he would go home for lunch, fall asleep, and not report back to work until the next day. *Id.* at 70:11–14.

McClain and Denise Donelson, a business account manager in LWI's Maitland office, testified that Plaintiff had actually been working reduced hours since 2006 or 2007, before the onset of his illness. *See* McClain Aff., Doc. 41, ¶ 6; Donelson Dep., Doc. 35, 17:10–22, 58:21–62:11. According to them, Plaintiff would normally arrive at work around 10:00 or 10:30 a.m., leave for lunch around 11:30 a.m., return two to three hours later, and then leave any time from 3:30 to 5:00 p.m. *See* McClain Aff., Doc. 41, ¶ 6; Donelson Dep., Doc. 35, 59:22–60:2. McClain also testified that following Plaintiff's initial request to take off the month of April 2009, Plaintiff did not ask him for any additional leave. McClain Aff., Doc. 41, ¶ 9.

3. *Plaintiff's Performance Review and Termination*

On April 27, 2009, Plaintiff met with McClain to discuss his annual written performance review. Doc. 60, ¶¶ 16–17; *see* Doc. 49-3, pp. 32–37. In the performance review, McClain indicated that in the past Plaintiff had excelled at the selling process, but over the past three years he had not performed to an expected level of sales and was now a "mediocre" agent. *See* Doc. 49-3, p. 33. McClain wrote that Plaintiff did not have the drive or desire to win, and needed to change his attitude and "focus on a work ethic that allows him to work at this process 8 to 10 hours a day 5 days a week." *Id.* The performance review made no reference to Plaintiff's illness or its impact on his performance. *See id.* Plaintiff, however, testified that he told McClain that the reason his production was down was because of his illness. Brown Dep., Doc. 49-1, 68:5–70:4.

Donelson testified that in the summer of 2009, Plaintiff told her that he was going back to the doctor because he may have been experiencing a "relapse" of his chronic fatigue. Donelson

Dep., Doc. 35, 58:12–20, 67:19–69:3.   Donelson relayed this information to McClain, who responded that Plaintiff had not mentioned anything about a relapse to him.   *Id.* at 68:4–24.

On November 9, 2009, Plaintiff was one of eleven LWI employees (eight support employees and three Property and Casualty Division sales agents) who were laid off as part of what LWI called a reduction in force ("RIF").[2]   Doc. 60, ¶ 18; Bowers Aff., Doc. 40, ¶ 5; McClain Aff., Doc. 41, ¶ 11.   One day after his termination, Plaintiff again visited with Weis, the nurse practitioner, who diagnosed him with chronic fatigue syndrome.   Dube Dep., Doc. 61-1, 54:22–56:18; *see* Doc. 61-2, p. 19.

Ostrander, the president of LWI, testified that the layoffs were necessary to reduce costs in response to declining revenues.   Ostrander Dep., Doc. 37, 30:17–20.   The RIF allowed the company to save money because the laid-off sales agents' books of business were transferred to other sales agents, who earned lower commission rates on those "gifted" books than the laid-off sales agents.   *See* McClain Dep., Doc. 39, 100:8–102:21; Bowers Dep., Doc. 34, 63:1–64:12. Plaintiff was 58 years old at the time of the layoffs, while Ray Lewis and Jim Morency, the other two laid-off sales agents, were 53 and 51 years old, respectively.   *See* Doc. 60, ¶¶ 4, 21–24. McClain and Ostrander, who were part of the management team that made the decision to implement the lay-offs, were both 61 years old at the time.   *See id.* at ¶¶ 10, 12, 20; Ostrander Dep., Doc. 37, 30:6–13.

Ostrander testified that LWI relied on its layoff policy in selecting which employees would be included in the RIF.   Ostrander Dep., Doc. 37, 34:11–25.   The layoff policy consisted of four criteria:   (1) promotion potential and transferability of skills to other positions within the company; (2) demonstrated current and past performance; (3) the needs of the company and

---

[2] LWI had undergone a previous round of layoffs in January 2009, resulting in the termination of eight or nine employees.   *See* Ostrander Dep., Doc. 37, 30:1–25.

specific projects; and (4) length of service with the company.   Doc. 38-1, p. 2.   However, Ostrander testified that for sales agents, the "determining factor" was the amount of new business generated in the current fiscal year.   Ostrander Dep., Doc. 38, 120:3–122:15.   He further testified that the management team had the following discussion in deciding to lay off Plaintiff:

> [H]is new business production was extremely low, the lowest of the agency.   And the fact that he was a seasoned producer, had been in production before, you know, gave us the sense that he was basically retiring in position and we needed to—you know, that wasn't helpful for us.   We needed him to produce new business.

*Id.* at 122:16–25.

McClain testified that he recommended Plaintiff for termination because he was one of the lowest-performing agents in the company and had a poor work ethic.   McClain Aff., Doc. 41, ¶ 11.   He testified that the main criteria used to determine the lowest-performing agents was the amount of new business they had generated during the current fiscal year beginning May 1, 2009, and that Plaintiff was ranked last among all agents in this classification.   *Id.*; *see* Doc. 41, p. 9.   According to McClain, the overall size of the agents' book of business and the length of time they were employed by LWI were less important factors than the amount of new business being generated.   McClain Aff., Doc. 41, ¶ 11.   McClain further testified that Plaintiff was failing to meet expectations in his ability to retain existing business, as his book of business was at least 30% lower than was expected of an agent with his experience.   *Id.*

Throughout 2009, LWI also hired seven sales agents, four of whom were assigned to the Maitland, Florida branch office where Plaintiff worked.   *See* Doc. 60, ¶¶ 25, 26, 28, 29, 31, 32, 34, 35, 37; McClain Dep., Doc. 39, 52:4–10.   At the time of Plaintiff's termination, all four Maitland agents were already working at LWI, and their respective ages were 38, 29, 25, and 25 years old.   *See* Doc. 60, ¶¶ 25–36.   All seven newly-hired sales agents were considered "training salesmen," meaning that they earned a base salary while they developed a book of business,

whereas experienced sales agents such as Plaintiff, Lewis, and Morency were paid mostly through commission.  McClain Dep., Doc. 39, 49:12–54:20.

### B.      Procedural History

Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations, and after receiving his notice of right to sue from the EEOC, filed the Complaint in this action on June 28, 2011.  *See* Docs. 1, 1-2, 1-3.  On August 29, 2011, Plaintiff filed an Amended Complaint alleging nine causes of action:  (1) disability discrimination in violation of the Americans with Disabilities Act ("ADA"); (2) failure to accommodate in violation of the ADA; (3) retaliation in violation of the ADA; (4) handicap discrimination in violation of the Florida Civil Rights Act ("FCRA"); (5) failure to accommodate in violation of the FCRA; (6) retaliation in violation of the FCRA; (7) discrimination in violation of the Age Discrimination in Employment Act ("ADEA"); (8) age discrimination in violation of the FCRA; and (9) interference with rights under the FMLA.  *See* Doc. 13.

Following discovery, LWI filed its Motion for Summary Judgment on all of Plaintiff's claims.  *See* Doc. 46.

## II.      STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact.  *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).  That burden can

be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 323.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 248-49 (emphasis in original). A fact is "material" if it may affect the outcome of the suit under governing law. *Id.* at 248. In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323.

## III.    ANALYSIS

### A.    Plaintiff's ADA Discrimination Claim

The ADA prohibits covered employers from discriminating on the basis of known physical or mental impairments of a qualified individual with a disability. *See* 42 U.S.C. § 12112. A plaintiff bringing an ADA discrimination claim must satisfy the same evidentiary burdens demanded in a Title VII discrimination case. *Hilburn v. Murata Electronics N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999). Under this framework, the plaintiff may avoid summary judgment through the use of either direct or circumstantial evidence of discrimination. *Bass v. Lockheed Martin Corp.*, 287 F. App'x 808, 810–11 (11th Cir. 2008). In this case, Plaintiff relies on both. *See* Doc. 52, pp. 13–17.

1.      *Direct Evidence*

Plaintiff argues that McClain's statement that "you don't get to sit on the bench while the rest of the team is out there and you're resting" is direct evidence of discriminatory intent.  *See* Doc. 52, p. 14.  The Court disagrees.  "Direct evidence is evidence, which if believed, proves the existence of [a] fact in issue without inference or presumption."  *Tran v. Boeing Co.*, 190 F. App'x 929, 932 (11th Cir. 2006) (internal citations and quotations omitted).  Thus, the proffered evidence must clearly indicate that the adverse employment action itself was motivated by discriminatory animus.  *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227–28 (11th Cir. 2002); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358–59 (11th Cir. 1999).  "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the protected classification are direct evidence of discrimination."  *Scott*, 295 F.3d at 1227 (internal citations and quotations omitted).  Indeed, "statements that are open to more than one interpretation do not constitute direct evidence of . . . discrimination."  *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998).

Here, McClain's statement that "you don't get to sit on the bench while the rest of the team is out there and you're resting" does not, by its terms, bear any relation to an employment decision made by McClain.  For example, McClain did not state that Plaintiff's job would be in jeopardy due to his illness.  For this reason alone, McClain's statement is not direct evidence of discriminatory intent.  *See Scott*, 295 F.3d at 1227–28; *Damon*, 196 F.3d at 1358–59.  Moreover, Plaintiff takes McClain's statement completely out of context.  When viewed in its broader context, McClain's statement is clearly open to multiple interpretations.  The statement was part of a larger block of deposition testimony which made clear that McClain had an ongoing conversation with Plaintiff, a former football player, about working harder to produce more sales.  *See* McClain Dep., Doc. 39, 111:12–113:1.  Thus, McClain's statement can easily be

interpreted as the use of a sports analogy to motivate Plaintiff in his sales capacity, rather than a demonstration of discriminatory animus towards Plaintiff's illness.   Accordingly, McClain's statement, at most, *suggests* discrimination, leaving the trier of fact to *infer* discrimination based on the evidence.  This, by definition, is circumstantial evidence, not direct evidence.  *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081–82 (11th Cir. 1990).

### 2.   *Circumstantial Evidence*

In the absence of direct evidence, Plaintiff asserts that there is sufficient circumstantial evidence of discrimination to survive summary judgment.  *See* Doc. 52, pp. 15–17.  Where a plaintiff offers circumstantial evidence to prove a discrimination claim, courts use the analytical framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998).  Under this framework, the plaintiff must establish a *prima facie* case of discrimination.  *Id*.  The establishment of a *prima facie* case creates a presumption of discrimination.  *Id*.  The employer must then offer legitimate, nondiscriminatory reasons for the employment action to rebut the presumption.  *Id*.  If the employer successfully rebuts the presumption, the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are pretextual.  *Id*.

However, the Eleventh Circuit has adopted a variant of the *McDonnell Douglas* burden-shifting test for RIF cases, such as this one.  *See Earley*, 907 F.2d at 1082.  Thus, to establish a *prima facie* case of discrimination in a RIF case using circumstantial evidence, a plaintiff must: (1) show he was a member of a protected group and was adversely affected by an employment decision; (2) prove he was qualified for his own position; and (3) produce sufficient evidence from which a rational factfinder could conclude that the employer intended to discriminate against him in making the discharge decision.  *Tran*, 190 F. App'x at 932–33.  If the plaintiff

establishes a *prima facie* case, the burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for the plaintiff's termination.  *Id.* at 933.  If the employer makes this showing, the burden then shifts back to the plaintiff to show that each reason offered by the employer was pretext, by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Id.* (internal citations and quotations omitted).

a.    *Plaintiff's Prima Facie Case*

LWI does not dispute that the first prong of Plaintiff's *prima facie* case is met, *i.e.*, that Plaintiff has a disability.  *See* Doc. 46, p. 10.  LWI does, however, argue that the second and third prongs are not met, contending that Plaintiff has not demonstrated he was qualified for his position and has not produced sufficient evidence from which a rational factfinder could conclude that LWI intended to discriminate against him in terminating his employment.  *See id.* at 10–12.

The Court first addresses the second prong.  Under the ADA, a "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds. . . ." *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000) (quoting 42 U.S.C. § 12111(8)).  The Eleventh Circuit has held that essential functions are the "fundamental job duties of a position that an individual with a disability is actually required to perform."  *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257 (11th Cir. 2007).  Moreover, "consideration shall be given to the employer's judgment as to what functions of the job are essential. . . ."  *Id.* (quoting 42 U.S.C. § 12111(8)).  LWI argues that working a full-time schedule and meeting sales expectations are "essential functions" of a sales agent position.  *See* Doc. 46, pp. 10–11.  LWI

contends that Plaintiff was unable to perform these functions, with or without accommodation, and therefore he cannot show that he was a qualified individual with a disability.  *See id.*

In support of its argument that working a full-time schedule is an essential function of a sales agent position, LWI points to Plaintiff's acknowledgment in his deposition testimony that the company hired him with the expectation that he would be working a full-time schedule.  *See id.* (citing Brown Dep., Doc. 49-1, 38:22–24).   While LWI's view that working a full-time schedule is an essential function of being a sales agent "is entitled to substantial weight in the calculus, this factor alone may not be conclusive."  *Holly*, 492 F.3d at 1258.  Indeed, "[w]hether a function is essential is evaluated on a case-by-case basis by examining a number of factors." *Id*.   Thus, when considering LWI's judgment regarding essential functions, the Court may consider not only the company's "official position," but also testimony from Plaintiff's supervisor.  *See id.* at 1257.  Here, McClain stated in his affidavit that Plaintiff was expected to work a full-time schedule.  McClain Aff., Doc. 41, ¶ 6.  However, in the very same affidavit, McClain acknowledged that Plaintiff had been working a significantly reduced schedule since "around 2006."  *Id*.  Donelson also testified that Plaintiff had been working a reduced schedule since 2007 or 2008, and that she had regular discussions with McClain about the time that Plaintiff spent in the office.  Donelson Dep., Doc. 35, 58:21–62:11.  Therefore, it is clear that LWI knew that Plaintiff was working far less than full-time for two to three years prior to the onset of his illness, but kept him employed in his sales position despite this knowledge. Accordingly, there is, at the very least, a genuine issue of material fact as to whether a full-time schedule was an essential function of a sales agent position at LWI.  *See Holly*, 492 F.3d at 1258–61 (holding that a genuine issue of material fact existed as to whether punctuality was an

essential function of plaintiff's job where supervisors testified to the contrary and there was no evidence that punctuality would cause the employer serious problems).

Similarly, the evidence does not support LWI's argument that meeting sales expectations was an essential function of the job.  Indeed, the evidence shows that Plaintiff failed to meet his new business goals in the 2005, 2007, and 2008 fiscal years, and was able to remain in his job. *See* Doc. 49-3, p. 65.  Moreover, the evidence shows that other agents who fell short of sales expectations also kept their jobs.  *See* Doc. 38-1, p. 20; Doc. 41, p. 9.  Therefore, at the very least, there is a genuine issue of material fact as to whether meeting sales expectations was an essential function of being a sales agent at LWI.  As a result, Plaintiff has satisfied his burden with respect to the second prong of his *prima facie* case.

Turning to the third prong of Plaintiff's *prima facie* case, LWI argues that Plaintiff has not produced sufficient circumstantial evidence from which a rational factfinder could conclude that LWI intended to discriminate against him in terminating his employment.  *See* Doc. 46, pp. 11–12.  The Court agrees.  Plaintiff's opinion that he was discriminated against, without more, is insufficient to establish a *prima facie* case.  *See Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997).  Moreover, the sole piece of circumstantial evidence which Plaintiff uses in support of his ADA discrimination claim is McClain's statement that "you don't get to sit on the bench while the rest of the team is out there and you're resting."[3]  *See* Doc. 52, pp. 15–17.  As the Court has explained in Part III.A.1, *supra*, Plaintiff takes this remark completely out of context.  When viewed in its proper context, it is clear that McClain's remark was part of a sports analogy,

---

[3] In his Response, Plaintiff jumbles his ADA and ADEA discrimination/retaliation arguments together, making it difficult for the Court to discern which arguments apply to which claims.  *See* Doc. 52, pp. 15–17.  However, most of the evidence he discusses in these arguments appears to apply toward his retaliation claims.  *See id*.  To the extent that his temporal proximity argument is applicable to his ADA discrimination claim, rather than his ADA retaliation claim, it is rejected for the reasons discussed in Part III.C, *infra*.

which McClain used on an ongoing basis to motivate Plaintiff and other sales agents to produce more sales. "[A] conversation fragment, devoid of any meaningful context, is simply too vague to prove even generalized discriminatory animus." *Standard*, 161 F.3d at 1329. No reasonable factfinder could conclude, based on McClain's remark alone, that LWI intended to discriminate against Plaintiff on the basis of his disability by terminating him. As a result, Plaintiff has failed to establish a *prima facie* case of ADA discrimination.

### b.    LWI's Legitimate, Nondiscriminatory Reason

Even assuming *arguendo* that Plaintiff established a *prima facie* case of discrimination, that would merely shift the burden to LWI to proffer a legitimate, nondiscriminatory reason for terminating him. This intermediate burden is "exceedingly light." *Holifield*, 115 F.3d at 1564. In addressing this burden, LWI submits that Plaintiff was terminated as part of a RIF because he was not fulfilling his sales goals and was the lowest producing sales agent at the company. *See* Doc. 46, p. 13. The evidence substantially supports LWI's position. Indeed, the evidence shows that LWI underwent two rounds of layoffs in 2009, and during the second round of layoffs eleven employees (including Plaintiff and two other sales agents) were terminated. McClain Aff., Doc. 41, ¶ 11; Ostrander Dep., Doc. 37, 30:1–25. LWI submitted evidence that the layoffs were a cost-cutting measure to address declining revenues. Ostrander Dep., Doc. 37, 30:17–20. McClain stated that the main criteria used to determine who would be laid off was the amount of new business generated during the current fiscal year, and that Plaintiff was ranked last among all agents in this classification. McClain Aff., Doc. 41, ¶ 11; *see* Doc. 41, p. 9. McClain further explained that Plaintiff was failing to meet expectations in his ability to retain existing business, as his book of business was at least 30% lower than was expected of an agent with his experience. McClain Aff., Doc. 41, ¶ 11. The Eleventh Circuit has repeatedly recognized that an employer in a discrimination case satisfies its burden by presenting evidence supporting the

16

proposition that the employee was terminated as part of a RIF.  *See, e.g.*, *Bass*, 287 F. App'x at 811–12; *Watkins v. Sverdrup Tech. Inc.*, 153 F.3d 1308, 1315 (11th Cir. 1998).  Accordingly, the Court finds that LWI has satisfied its burden of articulating a legitimate, nondiscriminatory reason for terminating Plaintiff.

c.      *Plaintiff's Burden of Showing Pretext*

Because LWI has satisfied its burden, the burden shifts back to Plaintiff to provide sufficient evidence showing that the legitimate reasons offered by LWI were a pretext for discrimination.  *See Bass*, 287 F. App'x at 811.  Plaintiff must show pretext "either directly by persuading the court that a discriminatory reason more likely motivated [LWI] or indirectly by showing that [LWI's] proffered explanation is unworthy of credence.  [Plaintiff] must meet the proffered reason head on and rebut it . . .  he cannot succeed by simply quarreling with the wisdom of that reason."  *Id.* at 812 (internal citations and quotations omitted).

Plaintiff has failed to persuade the Court that LWI was more likely motivated by discriminatory animus.  The only piece of evidence, direct or circumstantial, that Plaintiff pointed to in support of his ADA discrimination claim was McClain's remark that "you don't get to sit on the bench while the rest of the team is out there and you're resting."  *See* Doc. 52, p. 13–17.  For the same reasons discussed in Parts III.A.1 and III.A.2.a, *supra*, this statement is not sufficient to show discriminatory intent.  Thus, the Court cannot say that it is more likely that LWI was motivated by a discriminatory animus.

Nor has Plaintiff shown that LWI's proffered justifications are unworthy of credence.  In his Response, Plaintiff first attempts to cast doubt on LWI's claim that his layoff was part of a legitimate RIF due to declining revenues.  *See* Doc. 52, p. 18.  In support, he points to evidence that LWI hired seven new sales agents in 2009 and paid the newly-hired agents a base salary.  *See id.*  He argues that these personnel moves show that economic factors were not the true cause

of his termination.  *See id*.  Plaintiff's argument is misplaced.  The mere fact that the new sales agents were paid a base salary, while Plaintiff was not, does not support his contention that LWI's economic justification was pretextual.  To the contrary, the new sales agents were paid a base salary because they had little experience and small books of business.  McClain Dep., Doc. 39, 49:12–52:3; Ostrander Dep., Doc. 37, 65:4–22.  The base salary would guarantee the new agents a stream of income as they grew their books of business.  Once the new agents' sales exceeded their salaries, they would have the opportunity to earn commissions.  Ostrander Dep., Doc. 37, 65:4–22.  Experienced agents like Plaintiff, on the other hand, had larger books of business, and could earn more money through increasing commission rates.  *See* McClain Dep., Doc. 39, 48:7–49:6.  The RIF allowed the company to save money because the laid-off sales agents' books of business were transferred to other sales agents, who earned lower commission rates on those "gifted" books than the laid-off sales agents.  *See* McClain Dep., Doc. 39, 100:8–102:21; Bowers Dep., Doc. 34, 63:1–64:12.

Therefore, LWI's management team believed that layoffs were an appropriate method of cutting costs in response to declining revenues.  *See* Ostrander Dep., Doc. 37, 30:17–20. Whether LWI's reallocation of labor costs among its sales agents was, in hindsight, economically prudent is not a decision for this Court to make.  *See Chavez v. URS Fed. Technical Servs., Inc.*, 504 F. App'x 819, 821 (11th Cir. 2013) ("Whether an employment decision was prudent or fair is irrelevant, because an employer is free to choose whatever means it wants, so long as it is not discriminatory, in responding to bad economic conditions."). Accordingly, LWI's hiring of the new sales agents is not sufficient evidence to show that its proffered economic justification is pretext and that discriminatory animus was the true motivating factor.

Plaintiff next attacks LWI's assertion that he was chosen for termination because he failed to generate enough new business during the current fiscal year. *See* Doc. 52, p. 19. Plaintiff argues that LWI did not follow its own layoff policy in determining who would be included in the RIF because it failed to consider past performance and length of service, and that this is evidence that LWI's proffered justification was pretextual. *See id.*

However, even if LWI strayed from its layoff policy, deviation from company policy, standing alone, does not demonstrate discriminatory animus. *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355–56 (11th Cir. 1999). In any event, the evidence indicates that LWI *did* follow its layoff policy and *did* consider past performance and length of service when it selected Plaintiff for the RIF. *See* Ostrander Dep., Doc. 37, 34:11–25, Doc. 38, 120:6–122:15.[4] Accordingly, Plaintiff has failed to establish that LWI's proffered justification was pretext.

Plaintiff has failed to persuade the Court that a discriminatory reason more likely motivated LWI's decision or that the proffered explanations are unworthy of credence.[5] As a result, LWI is entitled to summary judgment on Plaintiff's ADA discrimination claim. *See Bass*, 287 F. App'x at 812.

---

[4] In his deposition, Ostrander testified that past performance was considered going back to May 2009—the start of LWI's new fiscal year—and strictly limited to new business because "that's what [LWI] needed." Ostrander Dep., Doc. 38, 120:6–25. He testified that length of service was taken into account when "everything else was equal." *Id.* at 121:1–10. Transferability of skills was not relevant to sales agents because "[p]roducing staff had one job and that was sales." *Id.* at 121:11–122:1. As to the last factor, Ostrander testified that "the needs of the company, very clearly, were new revenue." *Id.* at 122:2–15.

[5] In his Response, Plaintiff argues that LWI's "lack of new sales" justification is pretext because his performance issues were a direct result of the company's failure to provide him with sufficient leave time to recover from his illness. *See* Doc. 52, pp. 19–20. To the extent that this argument is applicable to his ADA discrimination claim, rather than his ADA failure to accommodate claim, it is rejected for the reasons discussed in Part III.B, *infra*. *Cf. Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) ("In our view, the acts [the plaintiff] describes relate directly to her 'reasonable accommodation' discrimination claim, not her retaliation claim, and accordingly provide no basis for denying summary judgment on this issue.").

### B.  Plaintiff's ADA Failure to Accommodate Claim

Plaintiff contends that LWI discriminated against him by denying him a reasonable accommodation of the one-month leave of absence he requested in March 2009.  *See* Doc. 52, pp. 7–13.  LWI disputes this, arguing that it did not deny his request.  *See* Doc. 46, pp. 15–17.

Under the ADA, an employer's failure to provide a reasonable accommodation can be a form of discrimination.  *See Holly*, 492 F.3d at 1262.  Indeed, under the ADA, "the term 'discriminate against a qualified individual on the basis of a disability' includes . . . not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business . . . ." 42 U.S.C. § 12112(b)(5)(A).  "Thus, an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship."  *Holly*, 492 F.3d at 1262.

To establish a *prima facie* claim for failure to accommodate, the plaintiff must show that: (1) he is disabled; (2) he is a qualified individual; and (3) he was discriminated against by way of the defendant's failure to provide a reasonable accommodation.  *McKane v. UBS Fin. Servs., Inc.*, 363 F. App'x 679, 681 (11th Cir. 2010).  "[T]he burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable.  Once the plaintiff has met her burden of proving that reasonable accommodations exist, the defendant-employer may present evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer."  *Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998).

In this case, LWI does not dispute that Plaintiff is disabled, and the Court has already found that he has satisfied his burden of showing that he was a "qualified individual" under the ADA. *See supra*, Part III.A.2.a. Thus, the first two prongs of Plaintiff's *prima facie* case are established. LWI argues that the third prong is not met because it never denied Plaintiff's request for a one-month leave of absence, and in fact granted his request, but that he came back two weeks early. *See* Doc. 46, pp. 15–17.

After reviewing the evidence, the Court finds that Plaintiff has failed to demonstrate that LWI did not accommodate his request for a one-month leave of absence. The evidence shows that in late March 2009, Plaintiff presented McClain with a doctor's note stating that he was being treated and should remain off work from April 1, 2009, through May 1, 2009. Doc. 60, ¶ 14. After taking two weeks off, Plaintiff returned to work on April 13, 2009. Brown Dep., Doc. 49-1, 78:13–80:7. Shortly thereafter, Plaintiff had a phone conversation with Bowers in which he told Bowers that he was not taking a full month of FMLA leave. *Id.* at 84:1–10. At Bowers' request, Plaintiff obtained a doctor's note stating he could return to work as of April 13, 2009. *Id.* at 81:8–82:8; Bowers Aff., Doc. 40, ¶ 8. Therefore, the evidence shows that LWI attempted to accommodate Plaintiff by granting him leave, but that he returned to work, thereby signaling to the company that he no longer needed the accommodation. "Liability simply cannot arise under the ADA when an employer does not obstruct an informal interactive process; makes reasonable efforts to communicate with the employee and provide accommodations based on the information it possesses; and the employee's actions cause a breakdown in the interactive process." *Stewart*, 117 F.3d at 1287.

Plaintiff argues that the only reason that he returned to work early was because he feared that he would be fired if he took a full month off, due to McClain's "push through" remarks.

Doc. 52, pp. 9–10.  However, Plaintiff's subjective belief that he would be fired for taking leave is insufficient evidence to survive summary judgment.  *See Webb v. R & B Holding Co., Inc.*, 992 F. Supp. 1382, 1388 (S.D. Fla. 1998).   No reasonable factfinder could conclude from McClain's statement that LWI was refusing to provide the accommodation requested by Plaintiff.  *See supra*, Part III.A.2.a.   As Plaintiff has failed to establish any request for accommodation that LWI refused to provide, summary judgment is warranted on his ADA failure to accommodate claim.[6]  *See Carper v. TWC Servs., Inc.*, 820 F. Supp. 2d 1339, 1356 (S.D. Fla. 2011) (summary judgment granted on the plaintiff's failure to accommodate claim where the evidence showed that he requested and was granted a leave of absence to undergo surgery, and that he returned from that leave with a note from his treating physician which indicated "no restrictions").

## C.    Plaintiff's ADA Retaliation Claim

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]."  42 U.S.C. § 12203(a).  "This provision creates a prohibition on retaliation under the ADA that is similar to Title VII's prohibition on retaliation."  *Stewart*, 117 F.3d at 1287.  Accordingly, ADA retaliation claims are assessed under the same framework employed for retaliation claims under Title VII.  *Id.*  As with an ADA discrimination claim, the plaintiff in an ADA retaliation claim can advance past the summary judgment stage by either introducing direct evidence of retaliation or by making a *prima facie*

---

[6] Plaintiff does not point to any requests for accommodation other than his March 2009 request for a month off.  *See* Doc. 52, pp. 9–11.  Although he told Donelson later that summer that he was going back to the doctor due to a possible "relapse" of his chronic fatigue, there is no evidence that he discussed this with McClain or that he requested a further accommodation.  *See* Donelson Dep., Doc. 35, 58:12–20, 67:19–69:3.   "[T]he duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999).

case using circumstantial evidence.  *See De La Cruz v. Children's Trust of Miami-Dade County*, 843 F. Supp. 2d 1273, 1281 (S.D. Fla. 2012).

Plaintiff argues that McClain's "sit on the bench" remark is direct evidence of retaliatory intent.  *See* Doc. 52, p. 14.  For the reasons discussed with respect to Plaintiff's ADA discrimination claim, the Court concludes that this remark does not rise to the level of direct evidence, and instead treats it as circumstantial evidence of retaliatory intent.  *See De La Cruz*, 843 F. Supp. 2d at 1281 ("For a supervisor's comment or demeanor to constitute direct evidence of retaliation, the comment or action must conclusively show bias that caused the adverse result in the workplace.").

Because Plaintiff has no direct evidence of retaliatory intent, he must use circumstantial evidence to establish a *prima facie* case of ADA retaliation.  To do this, he must show:  (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action.  *Wofsy v. Palmshores Retirement Community*, 285 F. App'x 631, 634 (11th Cir. 2008).  If Plaintiff establishes his *prima facie* case, the burden of production shifts to LWI to articulate a legitimate, non-retaliatory reason for the challenged action.  *Id*.  If LWI meets its burden, Plaintiff "must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination to avoid summary judgment."  *Id.* (internal citations and quotations omitted).

LWI does not dispute that the first prong of Plaintiff's *prima facie* case is met, *i.e.*, that Plaintiff engaged in protected activity under the ADA by requesting a one-month leave of absence as a reasonable accommodation.  *See* Doc. 46, p. 17.  Nor does LWI dispute that

Plaintiff suffered an adverse employment action when he was terminated.[7]  *See id.*  Rather, LWI contends that Plaintiff has not established the causal link required under the third prong of his *prima facie* case.  *See id.* at 17–18.

The causal link prong is "construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Criswell v. Intellirisk Mgmt. Corp., Inc.*, 286 F. App'x 660, 664 (11th Cir. 2008).  In an effort to establish a causal link, Plaintiff offers two pieces of circumstantial evidence.  First, he points to McClain's "sit on the bench" statement.  *See* Doc. 52, p. 17.  For the same reasons that this remark, standing alone, is insufficient evidence of discriminatory intent, the Court finds that it is also insufficient evidence of retaliatory intent.  *See supra*, Part III.A.2.a.

Second, he contends that the temporal proximity between his March 2009 conversation with McClain, in which he requested a month off, and his termination in November 2009 is adequate circumstantial evidence of retaliatory motive.  *See* Doc. 52, p. 17.  The Eleventh Circuit has recognized that, "[i]n some cases, a close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated."  *Criswell*, 286 F. App'x at 664.  However, the temporal proximity must be "very close."  *Id.* (quoting *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  Indeed, the Eleventh

---

[7] While there is no dispute that Plaintiff's termination was an adverse employment action, Plaintiff appears to argue in his Response that his negative performance evaluation in April 2009 was also an adverse employment action because it "precipitated his ultimate discharge."  *See* Doc. 52, p. 17.  However, in his Amended Complaint, Plaintiff does not describe the performance evaluation as an adverse employment action.  *See* Doc. 13, pp. 9–10.  In any event, the Court finds that the performance evaluation was not an adverse employment action because there is no evidence that the evaluation, in and of itself, had any effect on his employment.  *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) ("Negative performance evaluations, standing alone, do not constitute adverse employment action sufficient to satisfy the second element of a prima facie case of retaliation under the ADA.").  Therefore, the Court will treat only Plaintiff's termination in November 2009, and not the performance evaluation, as an adverse action.

Circuit has held that, in the absence of other evidence showing causation, even a three-month period of time between the statutorily-protected activity and the adverse employment action is insufficient to create a jury issue on causation. *Id.* (citing *Drago v. Jenne,* 453 F.3d 1301, 1308 (11th Cir. 2006)). Given the absence of other evidence tending to show causation, the Court finds that the eight-month lapse between Plaintiff's request for an accommodation in March 2009 and his discharge in November 2009 is insufficient to establish a causal link. *See Gray v. City of Jacksonville, Fla.,* 492 F. App'x 1, 10 (11th Cir. 2012) (holding that eight- and nine-month intervals constitute a substantial delay insufficient to establish causation). Accordingly, Plaintiff has failed to present a *prima facie* case of ADA retaliation.

Even if Plaintiff had established a *prima facie* case, the burden would merely shift to LWI to offer a legitimate, non-retaliatory reason for the adverse employment action. LWI has adequately done this, presenting evidence that Plaintiff was terminated as part of a RIF because he was the lowest-ranking sales agent in terms of new business generation. *See supra*, Part III.A.2.b. Thus, the burden would shift to Plaintiff to "introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination to avoid summary judgment." *Wofsy*, 285 F. App'x at 634 (internal citations and quotations omitted). Plaintiff is unable to do so, as he merely offers the same evidence of pretext for his ADA retaliation claim that the Court has already rejected for his ADA discrimination claim. *See supra*, Part III.A.2.c. Accordingly, LWI is entitled to summary judgment on Plaintiff's ADA retaliation claim.

## D.   Plaintiff's FCRA Disability Claims

Counts IV, V, and VI of Plaintiff's Amended Complaint are claims for relief under the FCRA for handicap discrimination, failure to accommodate, and retaliation, respectively. *See* Doc. 13, pp. 10–13. Disability claims under the FCRA are analyzed under the same framework as ADA claims. *See Sicilia v. United Parcel Serv., Inc.*, 279 F. App'x 936, 939 n.6 (11th Cir.

2008); *Albra v. Advan, Inc.*, 490 F.3d 826, 834 (11th Cir. 2007); *Matthews v. Vill. Ctr. Cmty. Dev. Dist.*, No. 5:05-cv-344, 2006 WL 3422416, at * 7 (M.D. Fla. Nov. 28, 2006). Accordingly, the Court's conclusion that LWI is entitled to summary judgment on Plaintiff's three ADA claims means that it is also entitled to summary judgment on his parallel FCRA claims.

### E.      Plaintiff's ADEA Discrimination Claim

The ADEA prohibits employers from taking an adverse employment action against an employee who is at least 40 years of age because of that employee's age. 29 U.S.C. §§ 623(a), 631(a). In *Gross v. FBL Financial Services, Inc.*, the Supreme Court held that a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the adverse employment action. 557 U.S. 167, 180 (2009). A plaintiff can establish age discrimination through either direct or circumstantial evidence. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013). In this case, Plaintiff relies on both. *See* Doc. 52, pp. 13–17.

#### 1.      *Direct Evidence*

Plaintiff argues that Ostrander's statement that Plaintiff "was basically retiring in [his] position" is direct evidence of age discrimination. *See* Doc. 52, pp. 14–15. The Court disagrees. Direct evidence of age discrimination is "evidence, which if believed, proves existence of [a] fact in issue without inference or presumption. Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." *Roberts v. Design & Mfg. Servs., Inc.*, 167 F. App'x 82, 84–85 (11th Cir. 2006) (internal punctuation and quotations omitted). Indeed, "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate[,] constitute direct evidence of discrimination." *Id.* (internal quotations omitted). Thus, "[i]n an age discrimination context, the quintessential example of

direct evidence would be a management memorandum saying, 'Fire Earley—he is too old.'" *Id.* (internal quotations omitted).

Ostrander's statement that Plaintiff "was basically retiring in [his] position" falls far short of this demanding standard. Therefore, even on its own, the statement is not direct evidence of age discrimination. When viewed in its proper context, it becomes even clearer that the statement is open to multiple interpretations. Ostrander made the statement during his deposition while explaining the management team's decision-making process in discharging Plaintiff. Ostrander testified that the fact that Plaintiff was an experienced producer, but still the lowest producer of new business in the company, "gave us the sense that he was basically retiring in position and we needed to—you know, that wasn't helpful for us. We needed him to produce new business." Ostrander Dep., Doc. 38, 122:16–25. There is no doubt that one could interpret this remark as directed toward Plaintiff's performance, rather than his age. Accordingly, Ostrander's statement, at most, *suggests* discrimination, leaving the trier of fact to *infer* discrimination based on the evidence. This, by definition, is circumstantial evidence, not direct evidence. *See Earley*, 907 F.2d at 1081–82.

## 2. *Circumstantial Evidence*

In the absence of direct evidence, Plaintiff asserts that there is sufficient circumstantial evidence of age discrimination to survive summary judgment. *See* Doc. 52, pp. 15–17. Even after the Supreme Court's decision in *Gross*, the Eleventh Circuit has continued to evaluate ADEA claims based on circumstantial evidence under the *McDonnell Douglas* burden-shifting framework. *See Mitchell v. City of LaFayette*, 504 F. App'x 867, 869 (11th Cir. 2013); *Sims*, 704 F.3d at 1332–33. Under this framework, a plaintiff may establish a *prima facie* case of ADEA discrimination in a RIF case by showing that: (1) he was in a protected age group; (2) he was adversely affected by an employment decision; (3) he was qualified for his current position

or to assume another position at the time of discharge; and (4) the evidence could lead a factfinder reasonably to conclude that the employer intended to discriminate on the basis of age. *Mitchell*, 504 F. App'x at 870.   Once a plaintiff establishes a *prima facie* case of age discrimination, the employer may rebut the resulting presumption of discrimination by articulating at least one legitimate, nondiscriminatory reason for its action.   *Id*.   Upon this showing, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reason is a pretext for discrimination.   *Id*.   Importantly, though, "the burden of persuasion always remains on the plaintiff in an ADEA case to proffer evidence sufficient to permit a reasonable fact finder to conclude that the discriminatory animus was the 'but-for' cause of the adverse employment action."   *Sims*, 704 F.3d at 1332.

It is undisputed that Plaintiff, who was 58 years old at the time of his termination, was in a protected age group under the ADEA and that he suffered an adverse employment action.   In addition, the Court has already determined that Plaintiff was qualified for his position.   *See supra*, Part III.A.2.a.   Therefore, to establish his *prima facie* case, Plaintiff must present evidence that could lead a factfinder reasonably to conclude that LWI intended to discriminate on the basis of his age.

Plaintiff first points to Ostrander's statement that Plaintiff "was basically retiring in [his] position."   *See* Doc. 52, pp. 14–15.   However, "a conversation fragment, devoid of any meaningful context, is simply too vague to prove even generalized discriminatory animus."   *Standard*, 161 F.3d at 1329.   As the Court has explained, Ostrander's statement, put in its proper context, clearly illustrates that Plaintiff was being selected for the RIF because of his inability to produce new business.   *See supra*, Part III.E.1.   No juror could reasonably conclude, based on this statement, that LWI intended to discriminate against Plaintiff based on his age.   *See*

*Standard*, 161 F.3d at 1329 (statement that "older people have more go wrong" is insufficient evidence from which a juror could reasonably find a discriminatory animus where the broader context does not show discrimination).

The only other piece of circumstantial evidence that Plaintiff attempts to use in making his *prima facie* case is his assertion that he was replaced with younger sales agents. *See* Doc. 52, p. 16. It is true that in 2009, the year that Plaintiff was discharged, LWI hired four new sales agents for its Maitland office, and that they were 38, 29, 25, and 25 years old at the time of his discharge. *See* Doc. 60, ¶¶ 25–36. However, each of those agents was already working for LWI months before Plaintiff was discharged. *See id.* at ¶¶ 25, 28, 31, 34. This belies the argument that Plaintiff was "replaced" by these agents. Moreover, Plaintiff cannot make the showing that he was "replaced" by younger sales agents, because the RIF's purpose was to reallocate LWI's costs by hiring agents paid by salary rather than commission. *See Mitchell*, 504 F. App'x at 871 ("Although [the plaintiff] is correct that he could establish a *prima facie* case in the traditional manner of showing that he was replaced by a younger individual, he is unable to make that showing, as the purpose of the RIF was to reallocate labor resources following a position elimination."). As explained previously, the new sales agents were paid a base salary because they were inexperienced and had small books of business, while Plaintiff and other experienced agents had larger books of business and were paid by commissions. *See supra*, Part III.A.2.c. Plaintiff has not presented any evidence that he was replaced by another commissioned sales agent. Accordingly, he has failed to produce sufficient evidence to establish a *prima facie* case of age discrimination.

Even if Plaintiff had satisfied his burden of establishing a *prima facie* case, LWI has offered the RIF and Plaintiff's lack of new business production as legitimate, nondiscriminatory

justifications for terminating him.  *See supra*, Part III.A.2.b.  As a result, the burden shifts back to Plaintiff to produce evidence that LWI's proffered reasons are pretext for discrimination.  *See Mitchell*, 504 F. App'x at 870.  Plaintiff may satisfy his burden "either directly by establishing that a discriminatory reason more likely than not motivated the employer, or indirectly by showing that the proffered reason is unworthy of credence.  Under the latter approach, [he] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered reason that a reasonable factfinder could conclude that it is unworthy of credit."  *Id.* at 871 (internal citations omitted).

Plaintiff has not carried his burden here.  He again points to the fact that LWI hired younger sales agents in his attempt to show that the RIF was pretextual.  *See* Doc. 52, p. 18–19.  However, "the fact [that] a company eliminates some positions in a RIF while simultaneously hiring younger workers in other positions is not sufficient to show that the RIF was pretextual.  A plaintiff must also show that the new positions were similarly situated to those that were eliminated in the RIF."  *Beaver v. Rayonier, Inc.*, 200 F.3d 723, 728 (11th Cir. 1999).  As explained previously, Plaintiff has not made this showing.  Beyond this, Plaintiff has rehashed the same arguments rejected by the Court previously.  *See* Doc. 52, pp. 18–20.  In sum, he has presented insufficient evidence that a discriminatory reason more likely than not motivated LWI, or that its proffered justifications are unworthy of credence.  As a result, Plaintiff has failed to demonstrate pretext, and LWI is entitled to summary judgment on his ADEA discrimination claim.

### F.      Plaintiff's FCRA Age Discrimination Claim

In Count VIII, Plaintiff alleges a claim for age discrimination under the FCRA.  *See* Doc. 13, pp. 14–15.  Age discrimination claims under the FCRA are analyzed under the same framework as ADEA claims.  *Brillinger v. City of Lake Worth*, 317 F. App'x 871, 875 n.3 (11th

Cir. 2008).   Accordingly, the Court's conclusion that LWI is entitled to summary judgment on Plaintiff's ADEA claim means that it is also entitled to summary judgment on his FCRA age discrimination claim.

### G.   Plaintiff's FMLA Interference Claim

The FMLA grants eligible employees the right to take up to 12 workweeks of unpaid leave annually "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293.   The FMLA creates a private right of action to seek equitable relief and money damages against employers who "interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights.   *Hurlbert*, 439 F.3d at 1293 (citing 29 U.S.C. §§ 2615(a)(1), 2617(a)).   To establish an FMLA interference claim, Plaintiff must demonstrate, by a preponderance of evidence, that he was denied a benefit to which he was entitled under the FMLA.   *Id.*   Plaintiff "need not allege that [LWI] intended to deny the benefit—the employer's motives are irrelevant." *Id.* (internal citations and quotations omitted).   Alternatively, Plaintiff may demonstrate that LWI *interfered* with the FMLA benefit. *Lowery v. Strength*, 356 F. App'x 332, 334 (11th Cir. 2009).   "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." *Id.* (quoting 29 C.F.R. § 825.220(b)).

Plaintiff argues that LWI wrongfully denied his FMLA leave request or, alternatively, that it interfered with his FMLA rights by discouraging him from taking a full month. *See* Doc. 52, pp. 8–11.   For the reasons discussed with respect to Plaintiff's ADA failure to accommodate claim, the Court finds that LWI did not deny his request for a month-long leave of absence. Rather, LWI granted his request and Plaintiff went back to work two weeks after beginning his leave, thereby terminating the leave period on his own. *See supra*, Part III.B.

The Court does, however, find merit in Plaintiff's argument that LWI discouraged him from taking a one-month leave of absence.  While McClain's suggestion to "push through" does not rise to the level of *denying* Plaintiff's request for a reasonable accommodation or FMLA leave, a reasonable juror could interpret the remarks as *discouraging* Plaintiff from taking the leave.  *See Lynch v. City of Largo, Fla.*, No. 8:10-cv-1064, 2011 WL 4634020, at *8 (M.D. Fla. Oct. 5, 2011) (finding a genuine issue of material fact as to whether the employer discouraged the plaintiff from taking further FMLA leave where, after the plaintiff took a period of leave, her supervisor asked her why she was missing so much work and what was wrong with her).  Accordingly, there is a genuine issue of material fact as to whether LWI discouraged Plaintiff from taking the leave, and the Court will deny LWI summary judgment on Plaintiff's FMLA interference claim.

## IV.    CONCLUSION

For the aforementioned reasons, LWI's Motion for Summary Judgment will be granted in part and denied in part.  As no genuine issues of material fact exist, LWI is entitled to a judgment in its favor on Counts I, II, III, IV, V, VI, VII, and VIII of the Amended Complaint. Because a genuine issue of material fact exists as to Count IX, Defendant's Motion for Summary Judgment will be denied as to Plaintiff's FMLA interference claim and it will proceed to trial.

Accordingly, it is hereby **ORDERED** and **ADJUDGED:**

1.    Defendant Lassiter-Ware, Inc.'s Motion for Summary Judgment (Doc. 46) is **GRANTED in part** and **DENIED in part.**

> a.    The Motion for Summary Judgment is **granted** as to Counts I, II, III, IV, V, VI, VII, and VIII.
>
> b.    The Motion for Summary Judgment is **denied** as to Count IX.

2.      At the conclusion of this litigation, a final summary judgment will be entered in favor of Defendant Lassiter-Ware, Inc. on Counts I, II, III, IV, V, VI, VII, and VIII of the Amended Complaint.

**DONE** and **ORDERED** in Orlando, Florida on August 16, 2013.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties